**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SONITHA SCALES, ALICIA THOMAS, STEPHEN MCNUTT, JEFF PORTER, & PAUL SIMONE, *individually, and on behalf of all other similarly situated individuals*, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 1:24-cv-11575 |
| v. | ) ) ) | Judge Manish S. Shah Magistrate Judge M. David Weisman |
| JAY MCGRAW; ERIC WELCH; CREDITSERVE, INC.; MINTO FINANCIAL d/b/a MINTO MONEY; and JOHN DOES 1-10, | ) ) ) ) ) | |
| Defendants. | ) | |

## <u>FIRST AMENDED COMPLAINT – CLASS ACTION</u>

Plaintiffs Sonitha Scales ("Plaintiff Scales"), Alicia Thomas ("Plaintiff Thomas"), Stephen McNutt ("Plaintiff McNutt"), Jeff Porter ("Plaintiff Porter"), and Paul Simone ("Plaintiff Simone") (collectively, "Plaintiffs"), individually, and on behalf of all similarly situated individuals, allege as follows:

1.      Usury—the practice of lending money at unreasonably high rates of interest—"is an ancient crime by which the powerful exploit the most poor and desperate." *Dunn v. Glob. Tr. Mgmt., LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020). And "[a]s ancient as the practice of usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition." *Id*. This case involves one of those schemes, which is commonly referred to as a "tribal lending" business model, or more colloquially, as "rent-a-tribe," a "recent incarnation of payday lending companies regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012).

1

2.      Under this model, non-tribal payday lenders and their business partners use Indian[1] tribes as a vehicle to originate illegal loans on the theory that the loans are subject exclusively to tribal law and the lender to sovereign immunity as a purported "arm-of-the-tribe," not the protections created by state usury, licensing, and consumer protection laws. But the loans nominally made by Minto Money are illegal irrespective of any purported tribal sovereign immunity, for sovereign immunity does not—and cannot—transform an otherwise illegal loan into a legal one. Rather, as the Fourth Circuit held in similar litigation: "substantive state law applies to off-reservation conduct," such as online loans marketed, collected, and paid by consumers in Illinois. *Hengle v. Treppa*, 19 F.4th 324, 348 (4th Cir. 2021); *see also Jackson v. Payday Fin., LLC*, 764 F.3d 765, 777-79 (7th Cir. 2014). And "although the Tribe itself cannot be sued for its commercial activities," its members, officers, and business partners "can be." *Hengle*, 19 F.4th at 348.

3.      Plaintiffs allege that Defendants Jay McGraw ("McGraw"), CreditServe, Inc. ("CreditServe"), Eric Welch ("Welch"), and Minto Financial d/b/a Minto Money (collectively, "Defendants") violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, which was expressly enacted "to seek the eradication of organized crime in the United States," including loan sharking. Pub. L. 91–452, § 1. McGraw, CreditServe, and Welch knowingly maintained an interest in, participated in the operation of, reinvested in, and conspired with other members of the enterprise to profit from the usurious loans nominally made by Minto Money.

---

[1] Throughout this complaint, Plaintiffs use the term "Indian" rather than "Native American," reflecting the fact that tradition, caselaw, and—perhaps most importantly—many indigenous persons themselves follow that practice.

2

4.     Plaintiffs seek actual, compensatory, punitive, statutory, and treble damages—as well as their costs and attorneys' fees—from Defendants for their participation in the unlawful lending enterprise complained of herein, which violated the usury and consumer protection laws of Plaintiffs' home states, unjustly enriched Defendants, and violated RICO. As a result of their participation in the enterprise, Defendants violated the usury laws of Plaintiffs' home states and RICO's prohibition against the "collection of unlawful debt," which RICO defines as a debt incurred in "the business of lending money" where "the usurious rate is at least twice the enforceable rate" under state of federal law. 18 U.S.C. § 1961(6).

5.     Plaintiff Scales also brings class claims for violations of the Interest Act, 815 ILCS 205/1 *et seq.*, and for violations of the Predatory Loan Prevention Act ("PLPA"), 815 ILCS 123/15-1-1 *et seq.*, and the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (the PLPA provides that violations of the PLPA are violations of the Consumer Fraud Act). In addition, Plaintiff McNutt brings claims for violations of California's usury and consumer protection statutes, Plaintiff Thomas brings claims for violations of the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO"), O.C.G.A. § 16-14-4, as well as for violations of the Georgia Payday Lending Act, O.C.G.A. § 16-17-1, *et seq.*, and Plaintiff Porter brings claims for violations of Washington's usury statutes and for violations of the Washington Consumer Protection Act, RCW 19.86.

6.     Further, Plaintiffs assert class common law claims for unjust enrichment and civil conspiracy. Because the enterprise's loans exceeded the interest rates permitted by the law of Plaintiffs' home states, such loans are null and void and neither the lender nor any third party may collect, obtain, or receive any principal, interest, or charges on the loans. *See* 815 ILCS 123/15-5-10; Cal. Fin. Code § 22750; Kan. Stat. § 16a-5-201; O.C.G.A. § 16-17-3; RCW § 31.04.035(2)(b).

Accordingly, Plaintiffs seek to recover all amounts paid on their and other class members' loans, as well as their costs and attorneys' fees.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs have asserted claims arising under the RICO Act, 18 U.S.C. § 1964. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

8.     The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because Plaintiffs and Defendants are citizens of different states; there are more than 100 members of the classes (as defined herein); and the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest and costs.

9.     This Court has personal jurisdiction over Defendants because RICO authorizes nationwide service of process. *Stauffacher v. Bennett*, 969 F.2d 455, 460 (7th Cir. 1992) (finding nationwide service of process in Section 1965(b)), superseded by *Cent. States, Se. & Sw. Areas Pension Fund v. Reiner Express World Corp.*, 230 F.3d 934 (7th Cir. 2000). As a result, personal jurisdiction over a defendant may be exercised anywhere in the United States so long as it does not violate the Fifth Amendment. *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668 (7th Cir. 1987).

10.     Because Defendants are all residents of the United States and have received monies from loans made in Illinois, the Court has personal jurisdiction over them under the Fifth Amendment to the Constitution of the United States. Further, this Court has personal jurisdiction over each of the defendants named herein because they: (1) knowingly participated in the making and collection of unlawful loans to Illinois residents, and (2) selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC*, 622 F.3d 754, 760 (7th Cir. 2010).

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in Illinois, including in this District and

4

Division. Venue is also proper in this Court pursuant to 28 U.S.C. § 1965(a) because Defendants transacted their affairs in Illinois through their participation in a conspiracy and receipt of millions of dollars from loans made in Illinois.

12.      Article III of the Constitution of the United States is satisfied because actions for statutory damages for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## <u>PARTIES</u>

13.      Plaintiff Sonitha Scales is a natural person, a resident of Darien, Illinois, and a citizen of Illinois.

14.      Plaintiff Alicia Thomas is a natural person and a resident and citizen of Georgia.

15.      Plaintiff Stephen McNutt is a natural person and a resident and citizen of California.

16.      Plaintiff Jeff Porter is a natural person and a resident and citizen of the State of Washington.

17.      Plaintiff Paul Simone is a natural person and a resident and citizen of Missouri. He lived in Kansas when the loan at issue was made to him, and during all other relevant times.

18.      Defendant CreditServe, Inc. is a corporation organized under the laws of California. Its principal place of business is 1421 Wells Branch Parkway, Pflugerville, Texas 78660, from where it, among other things, markets, funds, services, and collects loans made in the name of Minto Money.

19.     CreditServe knowingly contracted for or received, directly or indirectly, unlawful interest from loans nominally made by Minto Money to Plaintiffs, and consumers throughout the United States.

20.     Defendant Jay McGraw is a natural person and a citizen of Texas. On information and belief, his permanent residence is 3308 Ranch Road 620 N. Austin, TX 78734. McGraw is CreditServe's President and Secretary, and, upon information and belief, he provides capital used to fund loans nominally made by Minto Money. McGraw is the illegal enterprise's principal beneficiary.

21.     McGraw knowingly contracted for or received, directly or indirectly, unlawful interest from loans nominally made by Minto Money to Plaintiffs, and consumers throughout the United States.

22.     Defendant Eric Welch is a natural person and, upon information and belief, a resident and citizen of Texas. Welch is CreditServe's Chief Executive Officer and Chief Financial Officer. As such, he directs and authorizes it to engage in the high-interest lending activities complained of herein.

23.     Welch knowingly contracted for or received, directly or indirectly, unlawful interest from loans nominally made by Minto Money to Plaintiffs, and consumers throughout the United States. On information and belief, CreditServe operates for the benefit of Welch and McGraw.

24.     Defendant Minto Financial claims to be an entity formed under the laws of the Native Village of Minto (the "Tribe"). Plaintiffs therefore name it as a defendant. In return for a small fraction of the money generated from the Minto Money lending operation, the Tribe allowed the lending scheme to use its name and falsely claim that it is owned and operated by the Tribe. At

6

all times relevant hereto, the Tribe did not participate in the day-to-day operations of Minto Money and did not fund the loans or handle the servicing or collection of the same.

25.     Defendants John Does 1-10 are other natural and artificial persons involved in the illegal lending and collection activities described herein.

## FACTUAL BACKGROUND

### A.     State usury and licensing laws protect consumers from usurious loans

26.     "From times immemorial, governments have sought to protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013) (cleaned up). The United States is no exception. Indeed, "[a]s a nation, America has historically been deeply committed to usury law." Christopher Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1116 n.13 (2008)).

27.     That commitment "grew directly out of shared public consciousness and acceptance" of moral traditions and laws like the English Statute of Anne, "which capped interest rates with a simple nominal annual rate of 5%." *Id*. (citing *Act to Reduce the Rate of Interest*, 1713, s Ann., c. 16 (Eng.)). "The first American usury law, adopted by the Massachusetts colony in 1641, pre-dates the U.S. Constitution by nearly 150 years." *Id*. at 1117. That law limited interest rates to no more than 8% per annum. *Id*.

28.     While the states were divided on many issues, usury was not among them. Each of the original states "adopted usury laws capping interest rates" between 5% and 8%. *Id*.

29.     Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders. Almost every state in the country has enacted one or both of these

requirements, including Illinois, Georgia, Washington, California, and Kansas *i.e.*, Plaintiffs' home states where they applied for, received, and repaid their loans.

       **1.**       **Illinois**

30.      In Illinois, it is unlawful for anyone who does not have a bank or credit union charter, or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest. 815 ILCS 122/1-15, 4-5; 205 ILCS 670/1.

31.      Any loan made by an unlicensed person to an Illinois resident at an interest rate over 9% is void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Instalment Loan] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."); 815 ILCS 122/4-10(h) ("(h) Notwithstanding any other provision of this Section, if a lender who does not have a license issued under this [Payday Loan Reform] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the lender who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

32.      Any loan made by an unlicensed person to an Illinois resident at an interest rate exceeding 9% violates the Interest Act, 815 ILCS 205/4, and subject to statutory damages under 815 ILCS 205/6.

33.      Illinois' criminal usury statute provides that the making of a loan by an unlicensed person at more than 20% interest is a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq.*). The statute applies to a person who "while either within or outside the State, by his own conduct

or that of another for which he is legally accountable," engages in conduct that amounts to an offense if "the offense is committed either wholly or partly within the State[.]" 720 ILCS 5/1-5.

34.     Contracts made in violation of the licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice-of-law clauses nor other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.*, 16cv2781, 2017 U.S. Dist. LEXIS 64761, 2017 WL 1536427, *7 (D.N.J., April 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018).

35.     The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the internet or similar means to Illinois residents in Illinois. *See*, *e.g.*, *In the Matter of Red Leaf Ventures, LLC*, No. 12 CC 569; *In the Matter of Money Mutual, LLC*, No. 12 CC 408; *In the Matter of Hammock Credit Services*, No. 12 CC 581; *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133.

### a.     The Predatory Loan Prevention Act

36.     Effective March 23, 2021, the Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%. 815 ILCS 123/15-1-1 *et seq*. "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

37.     Under 815 ILCS 123/15-10-5(b), "[a]ny violation of the [PLPA], including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

38.     By, among other things, making or arranging the loans complained of herein, Defendants violated the Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq*.

39.     Defendants are "lender[s]" as defined in 815 ILCS 123/15-1-10, which defines "lender" to include "any person or entity…that offers or makes a loan, buys a whole or partial interest in a loan, arranges a loan for a third party, or acts as an agent for a third party in making a loan, regardless of whether approval, acceptance, or ratification by the third party is necessary to create a legal obligation for the third party . . . ."

40.     Under 815 ILCS 123/15-1-15(a), the PLPA "applies to any person or entity that offers or makes a loan to a consumer in Illinois."

41.     The PLPA specifically covers loans made to Illinois residents over the Internet. 815 ILCS 123/15-1-10 defines "loan" to include "closed-end and open-end credit, retail installment sales contracts, motor vehicle retail installment sales contracts, and any transaction conducted via any medium whatsoever, including, but not limited to, paper, facsimile, Internet, or telephone."

42.     815 ILCS 123/15-5-15, "no evasion," provides:

(a)     No person or entity may engage in any device, subterfuge, or pretense to evade the requirements of this Act, including, but not limited to, making loans disguised as a personal property sale and leaseback transaction; disguising loan proceeds as a cash rebate for the pretextual installment sale of goods or services; or making, offering, assisting, or arranging a debtor to obtain a loan with a greater rate or interest, consideration, or charge than is permitted by this Act through any method including mail, telephone, internet, or any electronic means regardless of whether the person or entity has a physical location in the State.

(b)     If a loan exceeds the rate permitted by Section 15-5-5, a person or entity is a lender subject to the requirements of this Act notwithstanding the fact that the person or

entity purports to act as an agent, service provider, or in another capacity for another entity that is exempt from this Act, if, among other things:

(1)    the person or entity holds, acquires, or maintains, directly or indirectly, the predominant economic interest in the loan; or

(2)    the person or entity markets, brokers, arranges, or facilitates the loan and holds the right, requirement, or first right of refusal to purchase loans, receivables, or interests in the loans; or

(3)    the totality of the circumstances indicate that the person or entity is the lender and the transaction is structured to evade the requirements of this Act. Circumstances that weigh in favor of a person or entity being a lender include, without limitation, where the person or entity:

    (i)    indemnifies, insures, or protects an exempt person or entity for any costs or risks related to the loan;

    (ii)    predominantly designs, controls, or operates the loan program; or

    (iii)    purports to act as an agent, service provider, or in another capacity for an exempt entity while acting directly as a lender in other states.

43.    Waiver of the PLPA is expressly forbidden. 815 ILCS 123/15-10-25 ("[t]here shall be no waiver of any provision of this Act."). The inclusion of "a nonwaiver provision is indicative of the Illinois legislature's intent to establish public policy." *Fahy v. Minto Dev. Corp.*, 722 F. Supp. 3d 784, 806 (N.D. Ill. 2024) (citations omitted).

44.    Any purported waiver of the PLPA is unconscionable and violative of a fundamental public policy of Illinois. *Harris v. FSST Mgmt. Servs., LLC*, 686 F. Supp. 3d 734, 743 (N.D. Ill. 2023).

### 2.    Georgia

45.    The Georgia General Assembly has codified numerous protections for consumers against predatory lenders via the Industrial Loan Act, O.C.G.A. § 7-3-1, *et seq.* (the "ILA"), the purpose of which is to "to define and prevent usury." *Georgia Cash Am., Inc. v. Greene*, 734 S.E. 2d 67, 71 (2012) (citation omitted).

46.     In 2020, the ILA was renamed the "Installment Loan Act," and was expanded to cover all loans of $3,000 or less, regardless of the interest rate. O.C.G.A. § 7-3-3(7).

47.     Unless expressly exempted by the terms of the ILA, a lender must obtain a license from the Georgia Department of Banking and Finance. O.C.G.A. § 7-3-4.

48.     A licensed lender may not charge, contract for, receive, or collect interest at a rate more than 10% per year. O.C.G.A. § 7-3-11(1).

49.     Pursuant to O.C.G.A. § 7-3-50(a), "[a]ny person, including the executive officers, directors, trustees, owners, agents, and employees of such person, that willfully engages in the business of making installment loans without a license or an exemption pursuant to Code Section 7-3-4 shall be guilty of a felony and punished as provided in Code Section 7-1-845." And any contract made by such person "shall be null and void." O.C.G.A. § 7-3-50.

50.     In 2004, the Georgia General Assembly "determined that payday lending continues in the State of Georgia and that there are not sufficient deterrents in the State of Georgia to cause this illegal activity to cease." O.C.G.A. § 16-17-1(c).

51.     According, the General Assembly passed the Payday Lending Act to end the business of usurious, small-dollar lending, which, as it noted in its legislative findings, has "an adverse effect upon military personnel, the elderly, the economically disadvantaged and other citizens of the State of Georgia." *Id*.

52.     Georgia's Payday Lending Act prohibits lenders from making loans of $3,000 or less at an interest rate exceeding 8% unless licensed to make such loans under the Industrial Loan Act or other laws regulating financial institutions. *See* Ga. Code Ann. § 16-17-1 *et seq*.

53.     The Payday Lending Act therefore makes it "unlawful for any person to engage in any business, in whatever form transacted, including, but not limited to, by mail, electronic means,

the Internet, or telephonic means, which consists in whole or in part of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less" at an APR that exceeds 16%, unless the lender is licensed to make such loans under the ILA or other laws regulating financial institutions. O.C.G.A. § 16-17-2.

54.     A lender who violates the Payday Lending Act "shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both." O.C.G.A. § 16-17-2(d).

55.     The Payday Lending Act further bars any lender of an unlawful loan from collecting any indebtedness and declares the loan "void ab initio." O.C.G.A. § 16-17-3. As a result, an unlicensed entity making payday loans has no right to collect, receive, or retain any principal, finance charges, or other fees in connection with such loans.

56.     Further, in the PLA, the Georgia General Assembly noted that "[c]ertain payday lenders have attempted to use forum selection clauses contained in payday loan documents in order to avoid the courts of the State of Georgia" and "determined that such practices are unconscionable and should be prohibited." O.C.G.A. § 16-17-1(d).

57.     Accordingly, "[a] payday lender shall not include in any loan contract made with a resident of this state any provision by which the laws of a state other than Georgia shall govern the terms and enforcement of the contract, nor shall the loan contract designate a court for the resolution of disputes concerning the contract other than a court of competent jurisdiction in and for the county in which the borrower resides or the loan office is located." O.C.G.A. § 16-17-2(c)(1).

58.     The Payday Lending Act also declares that "[a]n arbitration clause in a payday loan contract shall not be enforceable if the contract is unconscionable." O.C.G.A. § 16-17-2(c)(2); *see*

13

*also Davis v. Oasis Legal Fin. Operating Co., LLC*, 936 F.3d 1174, 1176–77 (11th Cir. 2019) ("Georgia's Payday Lending Act and Industrial Loan Act articulate a clear public policy against enforcing forum selection clauses in payday loan agreements and in favor of preserving class actions as a remedy for those aggrieved by predatory lenders. If Georgia's public policy regarding payday lenders is a horse, as Justice Burrough suggested, it carries these borrowers safely to a Georgia courthouse.").

### 3.    California

59.    "Usury—the charging of excessive interest rates—is an ancient practice dating back to the earliest commercial civilizations."[2] Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

60.    California—founded in 1850—has regulated interest rates since 1872. *See id.* at 1385.

61.    The law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

62.    Under the California Constitution, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan."

---

[2] Usury laws are not unique to the United States. Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin." Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012). Echoing these sentiments, Pope Francis has explained that "[u]sury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country." Pope Francis, *Address to National Anti-Usury Council* (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

*Dev. Acquisition Group, LLC v. EA Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const. Art. XV § 1).

63.     "An interest rate in excess of 10% is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Id.*

64.     California's usury laws are primarily designed to penalize those who take advantage of "unwary and necessitous borrowers," *Del Mar v. Caspe*, 222 Cal. App. 3d 1316, 1326 (Cal. Ct. App. 1990), and its consumer and borrower protections support a robust and longstanding public policy against the types of unconscionable and usurious loans funded by Defendants. The California statutory scheme is "liberally construed and applied to promote its underlying purposes and policies" including "to protect borrowers against unfair practices by some lenders," and "encourage the development of fair and economically sound lending practices." Cal. Fin. Code § 22001(a).

65.     If a lender makes a loan in violation of Art. XV § 1, then "[n]o person, company, association, or corporation shall directly or indirectly take or receive in money, goods, or things" and the loan is void. Cal. Civ. Code § 1916-2.

66.     Cal. Const. Art. XV § 1 reflects an important public policy of the State of California. California's prohibition on usury is enshrined in its constitution and the laws prohibiting usurious loans and granting recourse to those who have been wronged by such loans are created by statute and cannot be waived. A public policy that cannot be waived is fundamental.

67.     In addition to its general usury law, the loans at issue in this case violated California's financing laws because they were made without a license and imposed interest rates far greater than those permitted by California law. In addition, none of the Defendants has ever

15

had a lending license from the California Department of Financial Protection and Innovation ("DFPI").

68.     As a result, California law renders the entire contract "void," including the "right to collect or receive any principal, charges, or recompense in connection with the transaction." Cal. Fin. Code § 22750.

69.     Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq.*, which prohibits unlawful, unfair, or deceptive business practices. Cal. Bus. & Prof. Code § 17200.

### 4.     Washington

70.     The Washington usury statute provides that twelve percent is the maximum rate that may be exacted for the loan or forbearance of any money. RCW § 19.52.020. "No person shall directly or indirectly take or receive in money, goods, or things in action, or in any other way, any greater interest for the loan or forbearance of any money, goods, or things in action." RCW 19.52.020(1).

71.     If interest greater than the statutory maximum of twelve percent is directly or indirectly contracted for, received, or reserved, the contract is usurious. RCW 19.52.030.

72.     According to the Supreme Court of Washington, "Wash. Rev. Code § 19.52.005 declares that the policy of the state, as expressed by the legislature, is to protect the residents of the state from debts bearing burdensome interest rates; and in order to better effect the policy of the state to use the state's policies and courts to govern the affairs of its residents and the state; and in recognition of the duty to protect its citizens from oppression generally." *Whitaker v. Spiegel, Inc.*, 95 Wash. 2d 661, 664, 623 P.2d 1147, 1149 (1981).

73.     Indeed, the Washington legislature "views this policy as so fundamental as to include a choice of law provision extending the territorial application of the usury law to out-of-state contracts." *Id*. at 667.

74.     If a usurious interest rate is charged, a consumer may seek damages, including statutory damages. RCW 19.52.030.

75.     In addition to recovering as provided by RCW 19.52.030, entering into or transacting a usurious contract constitutes a per se unfair act or practice in the conduct of commerce for purposes of establishing a claim under the Washington Consumer Protection Act. RCW 19.52.036.

76.      RCW 19.134.070(1) provides, among other things, that "[a]ny waiver by a consumer of any part of this chapter is void."

77.     The Washington Consumer Protection Act (RCW 19.86.090) further provides that "[a]ny person who is injured in his or her business or property" by a violation of the act may bring a civil suit for injunctive relief, damages, attorney fees and costs, and treble damages."

78.     On March 25, 2024, Governor Jay Inslee signed the Predatory Loan Prevention Act into law (effective June 6, 2024), which amends the Washington Consumer Loan Act (Revised Code of Washington, Chapter 31.04) by significantly expanding the definition of a "loan," and adding broad anti-evasion provisions similar to those of the Illinois Predatory Loan Prevention Act.

79.     As amended, the Consumer Loan Act prohibits "a person" from engaging "in any device, subterfuge, or pretense to evade the requirements of this chapter…" RCW § 31.04.025(2). Such evasion includes "making, offering, assisting, or arranging a debtor to obtain a loan with a greater rate of interest, consideration, or charge than permitted by this chapter through any method,

17

including mail, telephone, internet, or any electronic means regardless of whether the person has a physical location in the state." *Id*.

80.     § 31.04.025(3) provides:

If a loan exceeds the rate permitted under this chapter, a person is a lender making a loan subject to the requirements of this chapter notwithstanding the fact that the person purports to act as an agent, service provider, or in another capacity for another person that is exempt from this chapter, if, among other things:

(a) The person holds, acquires, or maintains, directly or indirectly, the predominant economic interest in the loan; or

(b) The totality of the circumstances indicate that the person is the lender, and the transaction is structured to evade the requirements of this chapter.

81.     The Consumer Loan Act also requires a license to make consumer loans of any dollar amount that bear a finance charge, including both mortgage and non-mortgage loans, and requires a license to solicit, broker, arrange, or purchase non-mortgage consumer loans. RCW 31.04.035.

82.     If a loan is made without a license, "the loan is null, void, uncollectable, and unenforceable." RCW 31.04.035(2).

**5.     Kansas**

83.     Kansas prohibits the making of a loan to consumers at interest rates exceeding 15% without a supervised loan license. Kan. Stat. § 16a-2-404.

84.     "If a creditor has violated the provisions of this act … the loan is void and the consumer is not obligated to pay either the amount financed or finance charge." Kan. Stat. § 16a-5-201.

85.     Neither "Minto Money" nor any of the defendants named herein were licensed by the State of Kansas to make loans.

B. **Overview regarding the creation of the tribal lending business model**

86.     Many states have enacted usury laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today, Inc. v. Defreeuw*, 903 N.E.2d 1057, 1060 (Ind. Ct. App. 2009) (citing Christopher Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minn. L. Rev. 1110, 1116 n.13 (2008)).

87.     Unfortunately, despite state and some federal protections designed to prevent usurious lending, predatory financial services are heavily marketed to financially vulnerable consumers. The collection of unlawful and usurious loans continues to be a major problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to bear the risk of litigation and liability for their violations of state and federal law.

88.     Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

89.     It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

90.     Prior to the "rent-a-tribe" business model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws.[3] Such partnerships are

---

[3] *See*, *e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp., Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade*

commonly known as "rent-a-bank" schemes, as the bank participates only by lending its name and charter to the transaction.[4] Others attempted to evade state usury and consumer protection laws through claims that the loans were subject to the laws of a foreign country or state without any usury laws.

91.     In response to the crackdown on these arrangements, several payday lenders reincarnated the lending model through associations with Indian tribes to avoid state laws. Martin & Schwartz, *supra* at 759.

92.     Here, and in such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Indian tribes.

93.     However, the "tribal" lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation—funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections—are performed by individuals and entities that are unaffiliated with the tribe.

94.     In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

95.     However, an entity must function as a legitimate "arm of the tribe" to enjoy a tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010). 110. To determine if a particular entity is entitled to sovereign

---

*State Consumer Protection* at 17–22 (2001), available at http://www.consumerfed.org/pdfs/paydayreport.pdf.

[4] *See Pennsylvania v. Think Finance, Inc.*, No. 14-7139, 2016 WL 183289, at *1 (E.D. Pa. 2016) (describing rent-a-bank scheme, where a payday lender partners with "an out-of-state bank" to act "as the nominal lender while the non-bank entity [is] the de facto lender" in a partnership that seeks to take "advantage of federal bank preemption doctrines to insulate the [payday lending entities] from state regulation").

immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

96.     These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

97.     Where, as here, non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Indian tribes and, therefore, have no colorable claim to sovereign immunity.

98.     Further, as noted above, sovereign immunity, even if legitimately invoked, does not turn an otherwise illegal loan into a legal one. *See*, *e.g.*, *United States v. Neff*, 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

99.     Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on fourteen felony counts for their operation of a network of tribal lending

companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed by the Second Circuit in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

100. Nevertheless, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway of Katten Muchin Rosenman LLP, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

101. Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm-of-the-tribe lending or tribal member lending. *Id*.

102. Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

103. Callaway is one of several attorneys who represented payday lenders in these transactions; another is Jennifer Weddle of Greenberg Traurig.

104. On the other side of the table was Eric Lochen and representatives of his law firm, Lochen Law Offices PLLC, as well as an attorney named Shane Thin Elk ("Thin Elk").

105. Thin Elk formerly practiced law with Fredericks Peebles & Morgan LLP, a law firm with a significant practice devoted to, per its website, "Protecting Tribal Sovereignty," and Lochen Law Offices, PLLC, when he conducted seminars on "partnering with non-Tribal entities for commercial enterprises." He is now the owner of Thin Elk Law in Green Bay, Wisconsin, where he lives.

106.    Lochen and Think Elk share Callaway's erroneous legal opinion that loans nominally made through tribal entities do not need to comply with state licensing and usury laws— even when, as here, the tribe received only a nominal amount of the proceeds from the loans.

107.    On information and belief, with the assistance of Lochen and Thin Elk, McGraw, CreditServe, and Welch formed Minto Money in 2019.

108.    Like the prior schemes, this tribal lending model is highly problematic for several reasons. Most notably, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

109.    Over the past several years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied. *See*, *e.g.*, *Fahy v. Minto Dev. Corp.*, No. 23 C 3590, 2024 U.S. Dist. LEXIS 45147 (N.D. Ill. Mar. 14, 2024); *Harris v. FSST Mgmt. Servs., LLC*, 686 F. Supp. 3d 734 (N.D. Ill. 2023).

110.    In addition, there have been multiple class actions and government enforcement actions that have returned hundreds of millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *See generally Gibbs v. Plain Green, LLC*, Case No. 3:17-cv-495, ECF 141 (E.D. Va. Dec. 13, 2019) (order granting final approval of the class settlement).

111.    Despite all the litigation and enforcement efforts, McGraw, Welch, and CreditServe—together with others not yet known to Plaintiffs—knowingly aided, abetted, facilitated, and profited from the usurious lending scheme detailed herein.

C.     **Overview of Minto Money**

112.    Minto Financial claims to be an entity formed under the laws of the Tribe and owned by an economic development company, Benhti Economic Development Corporation ("BEDCO"), which claims to be owned by the Tribe.

113.    The Tribe is a small, isolated, and financially challenged tribe located about seventy-five miles northwest of Fairbanks, Alaska. It has approximately 223 enrolled members. The Tribe does not have a reservation. Neither Minto Money nor any other consumer lending business operates from lands claimed to be owned by the Tribe.

114.    And yet, "Minto Money" claims to operate under a "tribal lending license" signed by Thin Elk, the purported "commissioner" of the Minto Financial Services Licensing & Regulatory Commission.

115.    On information and belief, the "commission" has issued only one license in its existence: the one granted to operate Minto Money.

116.    The Minto Financial Services Licensing & Regulatory Commission was created immediately before issuing this single license.

117.    The "commission" places no restrictions on interest rates charged to consumers, unlike Alaska state law which limits payday loans to $500 and caps fees at $75 for such a loan.

118.    On information and belief, Thin Elk is not a member of the Tribe; rather, on information and belief, he is an enrolled member of a tribe located thousands of miles from Alaska.

119.    The main function of the Tribe is to appear, on paper at least, to control the lending operation so that McGraw, Welch, CreditServe and their investors can use the specter of tribal law and sovereign immunity as a way to ward off the consumers they victimize, as well as state and federal regulatory authorities.

120.     Although the Tribe holds itself out as the actual lender of the internet payday loans, the Tribe is merely a front, and CreditServe—at the direction of McGraw and Welch—provides the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: lead generation, technology platforms, payment processing, and collection procedures.

121.     Certain elders associated with the Tribe receive a 2% "fee" or "commission" on loan revenues.

122.     Upon information and belief, the Tribe had no control over the income or expenses of Minto Money.

123.     Instead, as in other schemes, the Tribe allowed McGraw, Welch, and CreditServe to use its name as a front and, in return, received a nominal, 2% flat fee of the revenue. *See*, *e.g.*, Delvin D. Hawley, *Payday Lenders on the Run, Bloomberg Business Week* (Feb. 8, 2016) ("Matt Martorello's company, Bellicose Capital, helps an American Indian tribe in Michigan run websites that offer small loans to the public at annualized interest rates as high as 780 percent. The tribe gets 2 percent of the revenue, while Martorello makes millions.").

124.     Upon information and belief, no member of the Tribe participates in the day-to-day operations of Minto Money and all of the activities associated with Minto Money occur far away from any lands claimed to be owned by the Tribe, such as the call centers, payment processing, and servicing of the loans.

125.     Despite representations that Minto Money is owned and operated by the Tribe, CreditServe, Welch, and McGraw are the de facto owners and control the lending enterprise. Put differently, the representations are false.

126. Upon information and belief, the money loaned to Plaintiffs was transferred from a bank account owned and operated or controlled by McGraw, Welch, and/or CreditServe, and neither the Tribe nor its officials were allowed to access the accounts.

127. Defendants falsely claim that Minto Money loans are made in Alaska and subject exclusively to "Tribal law."

128. At all times relevant Defendants operated an interactive website that was frequently accessed by consumers in Illinois relating to their high interest loans.

129. Defendants use the website www.mintomoney.com to make loans to consumers, including consumers in Illinois, California, and Kansas, at annual percentage rates in excess of 500%.

130. The website www.mintomoney.com is currently held via a proxy.

131. The servers used to host www.mintomoney.com are nowhere near Minto, Alaska.

132. The Minto Money website states that loans would not be made to persons in certain states. Illinois, Georgia, California, Washington, and Kansas were not among those states. On information and belief, the selection of states is tied to the likelihood of state officials taking enforcement action against Defendants.

**D. CreditServe, McGraw, & Welch's Involvement**

133. CreditServe, McGraw, Welch, and certain investors whose identities will be uncovered through discovery, are the primary beneficiaries of the Minto Money operation.

134. Neither McGraw nor Welch are affiliated with, or members of, the Tribe or BEDCO, nor are they Indians or members of any other federally recognized Indian tribe.

135. Likewise, CreditServe is not owned, operated, or affiliated with the Tribe or BEDCO—and no member of the Tribe has any say in its operation.

136.     CreditServe's principal place of business is in Pflugerville, Texas, where CreditServe maintains sprawling offices out of which it markets, services, and collects loans made in the name of Minto Money. CreditServe also operates a call center in the U.S. Virgin Islands.

137.     Jay McGraw is the President and Secretary of CreditServe. He is also the son of Dr. Phillip C. McGraw—the TV personality known as Dr. Phil. On information and belief, McGraw has provided tens of millions of dollars of capital to fund the loans made in the name of Minto Money.

138.     On information and belief, McGraw has received millions of dollars of illegal interest payments made by Plaintiffs and other consumers throughout the United States.

139.     Eric Welch is CreditServe's Chief Executive Officer and Chief Financial Officer. Welch is a veteran of the payday lending industry. He is also on the board of directors of the Online Lenders Alliance, a lobbyist for high interest lenders and their monied interests.

140.     Welch owns, or owned, many payday lending companies, including Helping Hand Financial, Inc. which did business in Texas as CashCash, Inc. Both lenders have been cited and fined by Texas regulatory authorities on multiple occasions.

141.     CreditServe employs approximately 100 people, including approximately 35 collection agents and 30 customer service agents. These employees are audited and monitored by CreditServe's quality assurance team, known internally as QA, who report to Welch and McGraw. Certain members of the QA team—including Kristine Macken—work from the U.S. Virgin Islands.

142.     McGraw and Welch dominate CreditServe and are responsible for all key decisions made by it.

143.     Welch and McGraw use a Minnesota company called Viking Client Services, LLC, doing business as Viking Business Services ("VBS") to process payments to Minto Money.

144.     VBS is the largest ACH payment broker and middleman servicing the "tribal" payday lending industry.

145.     Viking's website includes a testimonial from Welch, stating: "The Viking Team works tirelessly ensuring clients are well-serviced and informed, which makes Viking the most reliable payment processor in the industry. On top of their extended hours and Sunday night ACH processing, they can integrate with any software. The extended hours are not just for processing, but they provide customer service later than other processors. Pure and simple, Viking is easy to use, reliable, and they truly put their clients first."

146.     Viking, as Viking Billing Services, spends heavily to promote its services at trade conventions and similar; for example, it was a "Gold Level" sponsor of the Online Lenders Alliance ("OLA") 2022 Tribal Lending Conference, held November 1-3, 2022 at an upscale resort in Chandler, Arizona.

147.     According to the OLA, "Gold Level" sponsorship requires at least $20,000 in additional membership dues to be paid.

148.     Viking was also a premium sponsor at a similar industry gathering, the "Tribal Lending Summit" in August 2022.

149.     Viking processes ACH, debit card, and credit card payments for a large number of entities in the online payday lending industry, including Big Picture Loans, River Valley Loans, Oxford Financial Services, Inbox Loans, Better Day Loans, MaxLend, Blue Trust Loans, and many others.

150.   All of the aforementioned lenders claim "tribal" ownership but are actually operated by non-tribal entities as part of rent-a-tribe schemes, and all typically make loans at interest rates exceeding 600% annually

151.   In filings with the California and Ohio Secretaries of State, CreditServe claimed that it maintains an office at 137 N. Larchmont Suite 705, Los Angeles, California, 90004 (the "Larchmont Address").

152.   A California 501(c)(3) founded by Dr. Phil—When Georgia Smiled: The Robin McGraw and Dr. Phil Foundation (the "Foundation")—also claims to operate from the Larchmont Address. Dr. Phil is the Foundation's director.

153.   An attorney named Christopher Chatham served as the incorporator and agent for both CreditServe and the Foundation. Chatham is also the Foundation's Secretary and Treasurer.

154.   On information and belief, CreditServe, McGraw, and Welch together with non-tribal investors, provide the monies used to fund loans nominally made by Minto Money and are responsible for collecting such loans.

155.   On information and belief McGraw, Welch, and CreditServe have collected hundreds of millions of dollars of payments made by consumers like Plaintiffs on Minto Money loans.

156.   McGraw, Welch, and CreditServe are not employees, directors, affiliates, governors, parent companies, officers, members, or managers of the Tribe, BEDCO, or Minto Financial, and no principle-agent relationship exists between McGraw, Welch, or CreditServe, on the one hand, and the Tribe, BEDCO, or Minto Financial on the other.

### E. Plaintiffs' Experiences

157.    In January of 2022, Minto Money made a $1,050 loan to Plaintiff Scales at an annual percentage rate of 490.68%. The disclosed finance charge is $5,245.78.

158.    Plaintiff Scales made numerous payments on the loan, including interest payments.

159.    The loan was obtained for personal purposes and not for business purposes.

160.    Plaintiff Scales applied for the loan on the internet while located in Illinois. Plaintiff Scales did not travel to Alaska, or to any lands claimed to be owned by the Tribe to obtain the loan.

161.    Plaintiff Scales used her Illinois address when she applied for the loan and used her bank account maintained in Illinois to receive the loan and for the subsequent ACH debits to pay down the loan. Defendants debited Plaintiff Scales's bank account maintained in Illinois.

162.    As outlined in detail herein, Plaintiff Scales's loan is void and no principal, interest, fees, or other charges are recoverable in connection with the loan and all monies paid must be returned.

163.    At no time have any of the Defendants had a license from the Illinois Department of Financial and Professional Regulation or a state or federal banking or credit union charter, entitling them to make loans to Illinois residents at more than 9% interest.

164.    Defendants nevertheless advertise and make loans to Illinois residents at rates greatly exceeding 9%.

165.    Defendants sought out Illinois residents for such loans.

166.    On May 1, 2024, Minto Money made a $750 loan to Plaintiff McNutt at an annual percentage rate of 478.56%.

167.    Plaintiff McNutt made payments on the loan, including interest payments.

168.    The loan was obtained for personal purposes and not for business purposes.

169.     Plaintiff McNutt applied for the loan on the internet while located in California. Plaintiff McNutt did not travel to Alaska, or to any lands claimed to be owned by the Tribe to obtain the loan.

170.     Plaintiff McNutt used his California address when he applied for the loan and used his bank account maintained in California to receive the loan and for the subsequent ACH debits to pay down the loan. Defendants debited Plaintiff McNutt's bank account maintained in California.

171.     Because of the failure to comply with the State of California's usury and licensing requirements, Plaintiff McNutt's loan is void and no principal, interest, fees, or other charges are recoverable in connection with the loans. *See* Cal. Fin. Code § 22750.

172.     On October 30, 2024, Minto Money made a $450 loan to Plaintiff Porter at an annual percentage rate of 544.58%. The disclosed finance charge is $3,000.41.

173.     Plaintiff Porter made payments on the loan, including interest payments.

174.     The loan was obtained for personal purposes and not for business purposes.

175.     Plaintiff Porter applied for the loan on the internet while located in Washington. Plaintiff Porter did not travel to Alaska, or to any lands claimed to be owned by the Tribe to obtain the loan.

176.     Plaintiff Porter used his Washington address when he applied for the loan and used his bank account maintained in Washington to receive the loan and for the subsequent ACH debits to pay down the loan. Defendants debited Plaintiff's bank account maintained in Washington.

177.     None of the defendants have ever had a license from the Washington Department of Financial Institutions entitling them to make loans.

178.     In August of 2021, Minto Money made a $2,350 loan to Plaintiff Simone at an annual percentage rate of 502.80%. The disclosed finance charge is $11,740.01.

179.     Plaintiff Simone made payments on the loan, including interest payments.

180.     The loan was obtained for personal purposes and not for business purposes.

181.     Plaintiff Simone applied for the loan on the internet while located in Kansas. Plaintiff Simone did not travel to Alaska, or to any lands claimed to be owned by the Tribe to obtain the loan.

182.     Plaintiff Simone used his Kansas address when he applied for the loan and used his bank account maintained in Kansas to receive the loan and for the subsequent ACH debits to pay down the loan. Defendants debited Plaintiff's bank account maintained in Kansas.

183.     On or around December 16, 2024, Minto Money made a $1,050 loan to Plaintiff Thomas at an annual percentage rate of 701.27%. The disclosed finance charge is $5,028.56.

184.     Plaintiff Thomas made payments on the loan, including interest payments.

185.     The loan was obtained for personal purposes and not for business purposes.

186.     After receiving the loan, Ms. Thomas discovered that the APR vastly exceeded that which is permitted under Georgia law and so tried to undue the transaction. "Minto Money" would not agree to do so.

187.     Defendants are attempting to collect the loan and claim that over $6,000 is now due.

188.     No defendant is licensed by the State of Georgia to make loans.

189.    Similarly, almost all other states treat as illegal unlicensed small loans like those involved here.[5]

190.    Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Defendants knowingly participated in a widespread scheme to make and collect the loans at issue in this case, which have victimized hundreds of thousands of consumers on terms similar to Plaintiffs.

---

[5] Most states recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9¬A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53¬166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3¬201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

**F.** **Defendants violated state usury and consumer protection laws and RICO.**

191.     Defendants marketed and collected usurious loans in Illinois, Georgia, California, Washington, Kansas and throughout the United States. Defendants sought out residents of Illinois, Georgia, California, Washington, and Kansas for such loans.

192.     Because the interest rates on Plaintiffs' loans exceeded the maximum permitted by their home states, it was unlawful for any person, including Defendants, to collect or receive any interest, fees, or charges on the loans.

193.     Defendants nevertheless contend and represent on their website—and in materials sent in connection with attempts to collect the loans—that loans made in the name of Minto Money are valid and enforceable.

194.     Plaintiffs dispute that the loans are valid and enforceable.

195.     Upon information and belief, McGraw, CreditServe, and Welch have collected more than $500 million dollars from consumers in the United States pursuant to these illegal loans within the past four years.

196.     Defendants' conduct thus violated, among other statutes, § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

197.     RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

198.     Minto Money loan charged an interest rate greater than twice the enforceable rates established by Illinois, Georgia, California, Washington, and Kansas, and, thus, Defendants violated RICO's prohibition against the collection of unlawful debt.

199.     The means and methods by which McGraw, Welch, and CreditServe and other members and associates conducted and participated in the conduct of the affairs of the enterprise

34

was, and continues to be, the operation and control of the payday loan company in the business of lending money at usurious rates under the laws of numerous states, including Illinois, where the usurious rates charged were at least twice the enforceable rate. Defendants were directly and materially involved in this intentional misconduct. They knew the subject loans were illegal under Illinois, Georgia, California, Washington, and Kansas law—as well as the law of most states—but they actively participated in the solicitation of borrowers and the illegal lending enterprise anyway.

200. CreditServe or Minto Money are "enterprises" engaged in, and whose activities affect, interstate commerce, in that it is located outside of Illinois and makes loans to Illinois residents via the Internet. The enterprise's leadership is based in Texas, and other locations as addressed herein. The enterprise operates throughout the United States, including the Northern District of Illinois, as well as in the U.S. Virgin Islands.

201. Defendants are involved in the enterprise as described herein.

202. The enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities.

203. The lending enterprise operates through ACH transactions, such as those involving the payments by Plaintiffs. These ACH transactions involve interstate commerce because they flow through CreditServe, McGraw, and Welch's bank accounts in Wisconsin, Minnesota, and Missouri, Plaintiffs' bank accounts, and through various intermediaries across the United States. Additionally, the enterprise involves the receipt of usurious interest through interstate banking transactions to the Defendants in Texas and other places.

204. The lending enterprise operates through a website, created and overseen by McGraw, Welch, and CreditServe, at www.mintomoney.com. The website furthers the illegal financial transactions. The website allows individuals to enter information to execute ACH wire

transfers to the individual borrower and to debit the person's account in the purported repayment of the illegal debt. The website involves transactions in interstate commerce.

205. Defendants work together and function as a continuing unit for a common purpose of achieving the enterprise's objectives, namely the enrichment of Defendants through the advancement and collection of unlawful, usurious loans to desperate, unsophisticated borrowers. In operating and conducting the affairs of the enterprise, Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the enterprise. Defendants have modified and reinvested their collections of net revenue from the enterprise to improve the optics and viability of the business model.

206. The predicate acts of collection of unlawful debt by Defendants are described herein. The debts incurred by Plaintiffs and all other members of the Classes and Subclasses are unlawful and unenforceable.

207. Defendants established the illegal enterprise and have intentionally and willfully committed mail fraud and wire fraud through the use of ACH transactions to put money into Plaintiffs' and Classes and Subclasses members' accounts, by withdrawing funds from those accounts while maintaining that the withdrawals were legitimate, by using the Internet to obtain consent to a fraudulent lending agreement and choice of law provisions, and by using the mail to collect payments and communicate with other parts of the enterprise. 18 U.S.C. §§ 1341, 1343. The use of the mail and wire transfers was reasonably foreseeable because the form documents specifically call for the use of ACH transactions or mail to make payments on the illegal loans.

208. McGraw, Welch, and CreditServe, acting in concert with others, operated "Minto Money" in a scheme to defraud hundreds of thousands of thousands of people in a financially challenged position by extending loans at illegally high and extortionate interest rates. To advance

this scheme, Defendants created the enterprise, to initiate wire transfers and interstate mailings, and to operate via the Internet through which information was collected from the victims of the scheme and purported agreements were exchanged with targets of the scheme.

209.    Defendants knowingly intended to defraud Plaintiffs and other the victims of the lending scheme.

210.    The racketeering activity at issue is related and continuous. The hundreds of thousands of ACH transactions served and continue to serve the central scheme created and developed by Defendants to make illegal loans at extortionate interest rates. The hundreds of thousands of ACH transactions served the common scheme of evading state laws, defrauding people in financially challenged positions, and generating massive profits—for non-Tribal members. The scheme to evade state laws was designed, implemented, and/or maintained by Defendants.

211.    Defendants' participation in the enterprise began at some point as early as 2019, and continues to date, and will occur repeatedly in the future to the detriment of borrowers in the United States, including Illinois consumers. Each of the defendants, working in concert, participated in the scheme through a coordinated pattern of racketeering; such efforts include oversight and approval of the collection of thousands of unlawful debts. Through such coordination and operation of the lending business, Defendants induced Plaintiffs and members of the Classes and Subclasses to repay unlawful debts. The foregoing record demonstrates that Defendants, and in concert with others, created the entire lending structure in an effort to circumvent state and federal lending laws and regulations. Such intentional misconduct is exactly the type of coordinated activity that RICO was intended to stamp out.

212.    Plaintiffs were deprived of money as a result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful debt to the enterprise, which money transfers would not have been made but for Defendants' conduct. In addition, Plaintiffs and members of the below Classes and Subclasses have been deceived, coerced, and harassed to pay extortionate and usurious interest, as well as the principal, on unlawful debts.

213.    As a result of Defendants'—and other participants not yet known to Plaintiffs—participation in the enterprise and their violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT I:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

214.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

215.    This claim is brought individually and on behalf of the below classes.

216.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1962(d) Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming, and (3) repaid any amount on the loans.

> Plaintiffs are members of the § 1962(d) Class.

217.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Scales brings this action for herself and on behalf of a class—the "Illinois § 1962(d) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, and (3) repaid any amount on the loans.

> Plaintiff Scales is a member of the Illinois § 1962(d) Subclass.

218.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Thomas brings this action for herself and on behalf of a class—the "Georgia § 1962(d) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Georgia, and (3) repaid any amount on the loans.

> Plaintiff Thomas is a member of the Georgia § 1962(d) Subclass.

219.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff McNutt brings this action for himself and on behalf of a class—the "California § 1962(d) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from California, and (3) repaid any amount on the loans.

> Plaintiff McNutt is a member of the California § 1962(d) Subclass.

220.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Porter brings this action for himself and on behalf of a class—the "Washington § 1962(d) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Washington, and (3) repaid any amount on the loans.

> Plaintiff Porter is a member of the Washington § 1962(d) Subclass.

221.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Simone brings this action for himself and on behalf of a class—the "Kansas § 1962(d) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Kansas, and (3) repaid any amount on the loans.

> Plaintiff Simone is a member of the Kansas § 1962(d) Subclass.

222.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Minto Money and CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

223.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

224.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

225. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

226. As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans. Alternatively, CreditServe was an enterprise as defined in 18 U.S.C. § 1961(4).

227. In the alternative, Plaintiffs allege that "Minto Money" was an enterprise as defined by 18 U.S.C. § 1961(4)

228. All of the loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

229. Defendants violated § 1962(d) of RICO by agreeing to undertake and advance the usurious lending scheme, including by aiding, abetting, and facilitating the scheme through their funding of the loans. Defendants further violated including by aiding, abetting, and facilitating the

scheme through their role in the creation of the original agreements related to the origination, funding, and servicing of the loans, as well as the merger agreements designed to shield the non-tribal outsiders from liability and facilitate the continued illegal lending activities.

230.    Accordingly, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT II:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(b)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

231.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

232.    This claim is brought individually and on behalf of the below classes.

233.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1962(b) Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming, and (3) repaid any amount on the loans.

> Plaintiffs are members of the § 1962(b) Class.

234.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Scales brings this action for herself and on behalf of a class—the "Illinois § 1962(b) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, and (3) repaid any amount on the loans.

Plaintiff Scales is a member of the Illinois § 1962(b) Subclass.

235.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Thomas brings this action for herself and on behalf of a class—the "Georgia § 1962(b) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Georgia, and (3) repaid any amount on the loans.

Plaintiff Thomas is a member of the Georgia § 1962(b) Subclass.

236.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff McNutt brings this action for himself and on behalf of a class—the "California § 1962(b) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from California, and (3) repaid any amount on the loans.

Plaintiff McNutt is a member of the California § 1962(b) Subclass.

237.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Porter brings this action for himself and on behalf of a class—the "Washington § 1962(b) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Washington, and (3) repaid any amount on the loans.

Plaintiff Porter is a member of the Washington § 1962(b) Subclass.

238.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Simone brings this action for himself and on behalf of a class—the "Kansas § 1962(b) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Kansas, and (3) repaid any amount on the loans.

Plaintiff Simone is a member of the Kansas § 1962(b) Subclass.

239. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Minto Money or CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

240. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

241. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

242. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the

interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

243.    As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans.

244.    Alternatively, "Minto Money" was an enterprise as defined in 18 U.S.C. § 1961(4).

245.    All of the loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

246.    As alleged above, Defendants violated § 1962(b) of RICO by acquiring and maintaining interest in and control of the enterprise involved in the unlawful collection of debt. More specifically, Defendants engaged in the unlawful debt collection to maintain an interest and control of the enterprises identified above.

247.    Through their status as major investors, Defendants exercised considerable control over how Minto Money carried out the unlawful lending scheme as a whole. As detailed above, Defendants also reinvested the usurious proceeds back into the lending scheme, thereby increasing their involvement and the number of loans made to consumers, such as Plaintiffs.

248.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(b) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

249.     As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## COUNT III:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

250.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

251.     This claim is brought individually and on behalf of the below classes.

252.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs brings this action for themselves and on behalf of a class—the "§ 1962(a) Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming, and (3) repaid any amount on the loans.

> Plaintiffs are members of the § 1962(a) Class.

253.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Scales brings this action for herself and on behalf of a class—the "Illinois § 1962(a) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, and (3) repaid any amount on the loans.

Plaintiff Scales is a member of the Illinois § 1962(a) Subclass.

254.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Thomas brings this action for herself and on behalf of a class—the "Georgia § 1962(a) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Georgia, and (3) repaid any amount on the loans.

Plaintiff Thomas is a member of the Georgia § 1962(a) Subclass.

255.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff McNutt brings this action for himself and on behalf of a class—the "California § 1962(a) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from California, and (3) repaid any amount on the loans.

Plaintiff McNutt is a member of the California § 1962(a) Subclass.

256.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Porter brings this action for himself and on behalf of a class—the "Washington § 1962(a) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Washington, and (3) repaid any amount on the loans.

Plaintiff Porter is a member of the Washington § 1962(a) Subclass.

257.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Simone brings this action for himself and on behalf of a class—the "Kansas § 1962(a) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Kansas, and (3) repaid any amount on the loans.

Plaintiff Simone is a member of the Kansas § 1962(a) Subclass.

258. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Minto Money and CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

259. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants reinvested in the enterprise; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

260. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

261. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the

interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

262.    As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans.

263.    Alternatively, "Minto Money" and CreditServe were enterprises as defined in 18 U.S.C. § 1961(4).

264.    All of the loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

265.    As alleged above, Defendants violated § 1962(a) of RICO in three separate and distinct ways—any one of which independently suffices.

266.    First, Defendants violated § 1962(a) of RICO by receiving income derived from the unlawful collection of debt and using and investing such income in the establishment and operation of the tribal lending scheme.

267.    Second, Defendants violated § 1962(a) of RICO by receiving income derived from the unlawful collection of debt through the tribal lending scheme and reinvesting that income into the tribal lending scheme in order to increase the size of the scheme.

268.     Third, Defendants violated § 1962(a) of RICO by using their income and proceeds to restructure usurious lending scheme and through the creation of the promissory notes entitling them to millions of dollars of future revenues of Minto Money.

269.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(a) because the loans would not have been made but for Defendants' investment and participation in the enterprise.

270.     As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT IV:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

271.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

272.     This claim is brought individually and on behalf of the below classes.

273.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "§ 1962(c) Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming, and (3) repaid any amount on the loans.

> Plaintiffs are members of the § 1962(c) Class.

274.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Scales brings this action for herself and on behalf of a class—the "Illinois § 1962(c) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, and (3) repaid any amount on the loans.

> Plaintiff Scales is a member of the Illinois § 1962(c) Subclass.

275.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Thomas brings this action for herself and on behalf of a class—the "Georgia § 1962(c) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Georgia, and (3) repaid any amount on the loans.

> Plaintiff Thomas is a member of the Georgia § 1962(c) Subclass.

276.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff McNutt brings this action for himself and on behalf of a class—the "California § 1962(c) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from California, and (3) repaid any amount on the loans.

> Plaintiff McNutt is a member of the California § 1962(c) Subclass.

277.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Porter brings this action for himself and on behalf of a class—the "Washington § 1962(c) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Washington, and (3) repaid any amount on the loans.

> Plaintiff Porter is a member of the Washington § 1962(c) Subclass.

278.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Simone brings this action for himself and on behalf of a class—the "Kansas § 1962(c) Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Kansas, and (3) repaid any amount on the loans.

Plaintiff Simone is a member of the Kansas § 1962(c) Subclass.

279.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Minto Money and CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

280.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

281.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

282.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

283.    As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans. Alternatively, "Minto Money" and CreditServe were enterprises as defined in 18 U.S.C. § 1961(4).

284.    All of the loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

285.    As alleged above, Defendants participated in the operation of the enterprise, which existed for the purpose of collection of unlawful debt. Among other things and as detailed above, Defendants helped design, implement and fund the tribal lending scheme.

286.     Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) because the loans would not have been made but for Defendants' participation in the enterprise.

287.     As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT V:**
**VIOLATIONS OF GEORGIA RICO**
**Ga. Code Ann. §§ 16-14-4(a), 16-14-6**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

288.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

289.     Plaintiff Thomas brings this claim individually and on behalf of the below class.

290.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Thomas brings this action for herself and on behalf of a class—the "Georgia § 16-14-4(a) Class"—initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Georgia, and (3) repaid any amount on the loans.

> Plaintiff Thomas is a member of the Georgia § 16-14-4(a) Class.

291.     Plaintiff Thomas may alter the class definition to conform to developments in the case and discovery.

292.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** While Plaintiff Thomas does not know the exact number of class members at this time, based on the class sizes in similar cases, Plaintiff Thomas anticipates that there are likely thousands of members. Thus, the Class is so numerous that joinder of all members is impracticable. Additionally, the names and addresses of the class

54

members are identifiable through the internal business records maintained by Defendants and Minto Money, and the class members may be notified of the pendency of this action by published and/or mailed notice.

293. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of each Class, and there are no factual or legal issues that differ between the putative class members. These questions will predominate over the questions affecting only individual class members. The common questions include: (1) whether the form loan agreements contain invalid and unenforceable choice-of-law and dispute resolution provisions; (2) the facts surrounding the organization, structure and funding of the underlying enterprise, including with regard to control over the business and the performance of the various lender functions, as well as the flow of lending capital and revenue; (3) the nature and extent of Defendants' knowledge and participation in the affairs of the enterprise; (4) whether the loans are "unlawful debt" for purposes of RICO; (5) whether the loans are unlawful payday loans under Georgia RICO and/or the Industrial Loan Act or Payday Lending Act; (6) whether Defendants violated RICO and/or Georgia RICO by collecting on the loans; and (7) what is the proper recovery for Plaintiff and the class members against Defendants.

294. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Thomas's claims are typical of the claims of each putative class member. In addition, Plaintiff Thomas is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

295. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Thomas is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained

counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Thomas nor her counsel have any interests which might cause them to not vigorously pursue this action.

296.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

297.     **Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).** Defendants have acted or refused to act on grounds that apply generally to the class, rendering injunctive and declaratory relief appropriate respecting the class as a whole.

298.     Under Georgia's RICO statute, it is "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money." Ga. Code Ann. § 16-14-4(a).

299. Violations of the PLA are predicate acts and racketeering activity.

300. Defendants have engaged in a pattern of racketeering activity by their violation of the PLA.

301. Conspiracy and/or endeavoring to violate the substantive provisions of Georgia's RICO Act is a separate violation of the statute. Ga. Code Ann. § 16-14-4(c).

302. Through their conduct, Defendants have violated and/or conspired to violate Georgia's RICO Act.

303. Each Defendant individually and the Minto Money operation collectively constitutes an "enterprise" as that term is defined in Ga. Code Ann. § 16-14-3(3), in that the term applies to a single person, as well as any "partnership . . . or other legal entity" or "group of individuals associated in fact."

304. Defendants engaged in a "pattern of racketeering activity," as that term is defined in Ga. Code Ann. §§ 16-14-3(4) and 16-4-13(5)(A)(xxxvii), because they each committed, attempted to commit, and/or solicited others to commit at least two acts of collection of unlawful payday loans in violation of Chapter 17 of Title 16 the Georgia Code, Ga. Code Ann. § 16-17-2(d).

305. Plaintiff Thomas and the Georgia RICO Class members were injured as a direct result of Defendants' violations of Ga. Code Ann. § 16-14-4(a) by, among other things, the payment of unlawful debt to the Enterprise, which money transfers would not have been made but for Defendants' conduct.

306. Accordingly, Defendants are jointly and severally liable to Plaintiff Thomas and the Georgia § 16-14-4(a) Class for their actual damages, treble damages, punitive damages, costs, and attorneys' fees pursuant to Ga. Code Ann. § 16-14-6(c).

307.     Plaintiff and the Georgia § 16-14-4(a) Class have further been, and will continue to be, irreparably harmed by Defendants' violations of Georgia RICO § 16-14-4(a) such that they are entitled to injunctive relief under § 16-14-6(a)-(b) enjoining Defendants from, at a minimum, collecting on any unlawful loans issued to Plaintiff Thomas and the Class or continuing to issue such loans in violation of Georgia RICO and the Payday Lending Act.

### COUNT VI:
### VIOLATIONS OF GEORGIA RICO
### Ga. Code Ann. §§ 16-14-4(b), 16-14-6
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

308.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

309.     Plaintiff Thomas brings this claim individually and on behalf of the below class.

310.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Thomas brings this action for herself and on behalf of a class—the "Georgia § 16-14-4(b) Class"—initially defined as follows:

> All natural persons who:(1) entered into a loan agreement with Minto Money, (2) from Georgia, and (3) repaid any amount on the loans.

> Plaintiff Thomas is a member of the Georgia § 16-14-4(b) Class.

311.     Plaintiff Thomas may alter the class definition to conform to developments in the case and discovery.

312.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Currently, Plaintiff Thomas does not know the exact number of members of each Class. However, based on the class sizes in similar cases, Plaintiff anticipates that there are likely thousands of members. Thus, the Class is so numerous that joinder of all members is impracticable. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants and

Minto Money, and the class members may be notified of the pendency of this action by published and/or mailed notice.

313.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of each Class, and there are no factual or legal issues that differ between the putative class members. These questions will predominate over the questions affecting only individual class members. The common questions include: (1) whether the form loan agreements contain invalid and unenforceable choice-of-law and mandatory dispute resolution provisions; (2) the facts surrounding the organization, structure and funding of the underlying enterprise, including with regard to control over the business and the performance of the various lender functions, as well as the flow of lending capital and revenue; (3) the nature and extent of Defendants' knowledge and participation in the affairs of the enterprise; (4) whether the loans are "unlawful debt" for purposes of RICO; (5) whether the loans are unlawful payday loans under Georgia RICO and/or the Industrial Loan Act or Payday Lending Act; (6) whether Defendants violated RICO and/or Georgia RICO by collecting on the loans; and (7) what is the proper recovery for Plaintiff and the class members against Defendants.

314.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Thomas's claims are typical of the claims of each putative class member. In addition, Plaintiff Thomas is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

315.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Thomas is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and they have and intend to continue to

prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Thomas nor her counsel have any interests which might cause them to not vigorously pursue this action.

316.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

317.    **Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).** Defendants have acted or refused to act on grounds that apply generally to the class, rendering injunctive and declaratory relief appropriate respecting the class as a whole.

318.    As set forth above, Defendants have also participated in the enterprise through a pattern of racketeering activity in violation of Ga. Code Ann. § 16-14-4(b).

319.    Plaintiff Thomas and the Georgia RICO Class members were injured as a direct result of Defendants' violations of Ga. Code Ann. § 16-14-4(b) by, among other things, the

payment of unlawful debt to the Enterprise, which money transfers would not have been made but for Defendants' conduct.

320.     Accordingly, Defendants are jointly and severally liable to Plaintiff Thomas and the Georgia § 16-14-4(b) Class for their actual damages, treble damages, punitive damages, costs, and attorneys' fees pursuant to Ga. Code Ann. § 16-14-6(c).

321.     Plaintiff Thomas and the Georgia § 16-14-4(b) Class have further been, and will continue to be, irreparably harmed by Defendants' violations of Georgia RICO § 16-14-4(b) such that they are entitled to injunctive relief under § 16-14-6(a)-(b) enjoining Defendants from, at a minimum, collecting on any unlawful loans made to Plaintiff Thomas and the Georgia § 16-14-4(b) Class or continuing to issue such loans in violation of Georgia RICO and the Payday Lending Act.

**COUNT VII:**
**VIOLATIONS OF GEORGIA RICO**
**Ga. Code Ann. §§ 16-14-4(c), 16-14-6**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

322.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

323.     Plaintiff Thomas brings this claim individually and on behalf of the below class.

324.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Thomas brings this action for herself and on behalf of a class—the "Georgia § 16-14-4(c) Class"—initially defined as follows:

> All natural persons who:(1) entered into a loan agreement with Minto Money, (2) from Georgia, and (3) repaid any amount on the loans.

> Plaintiff Thomas is a member of the Georgia § 16-14-4(c) Class.

325. Plaintiff Thomas may alter the class definition to conform to developments in the case and discovery.

326. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Currently, Plaintiff Thomas does not know the exact number of members of the Class. However, based on the class sizes in similar cases, Plaintiff anticipates that there are likely thousands of members. Thus, the Class is so numerous that joinder of all members is impracticable. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants and Minto Money, and the class members may be notified of the pendency of this action by published and/or mailed notice.

327. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of each Class, and there are no factual or legal issues that differ between the putative class members. These questions will predominate over the questions affecting only individual class members. The common questions include: (1) whether the form loan agreements contain invalid and unenforceable choice-of-law and mandatory dispute resolution provisions; (2) the facts surrounding the organization, structure and funding of the underlying enterprise, including with regard to control over the business and the performance of the various lender functions, as well as the flow of lending capital and revenue; (3) the nature and extent of Defendants' knowledge and participation in the affairs of the enterprise; (4) whether the loans are "unlawful debt" for purposes of RICO; (5) whether the loans are unlawful payday loans under Georgia RICO and/or the Industrial Loan Act or Payday Lending Act; (6) whether Defendants violated RICO and/or Georgia RICO by collecting on the loans; and (7) what is the proper recovery for Plaintiff Thomas and the class members against Defendants.

328. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Thomas's claims are typical of the claims of each putative class member. In addition, Plaintiff Thomas is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

329. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Thomas is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Thomas nor her counsel have any interests which might cause them to not vigorously pursue this action.

330. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

331.   **Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).** Defendants have acted or refused to act on grounds that apply generally to the class, rendering injunctive and declaratory relief appropriate respecting the class as a whole.

332.   As set forth above, Defendants have also conspired with themselves and others in the enterprise to violate Ga. Code Ann. §§ 16-14-4(a) and 16-14-4(b), and each has committed and continues to commit multiple overt acts in furtherance of the conspiracy (e.g., the issuance and collection of unlawful loans in Georgia; establishment of the lending entity; and other actions to evade Georgia law), in violation of Ga. Code Ann. § 16-14-4(c).

333.   Defendants have also endeavored to violate Ga. Code Ann. §§ 16-14-4(a) and 16-14-4(b), and have committed and continue to commit multiple overt acts in furtherance of the objective of that endeavor (e.g., the issuance and collection of unlawful loans in Georgia; establishment of the lending entity; and other actions to evade Georgia law), in violation of Ga. Code Ann. § 16-14-4(c).

334.   Plaintiff Thomas and the Georgia § 16-14-4(c) Class were injured as a direct result of Defendants' violations of Ga. Code Ann. § 16-14-4(c) by, among other things, the payment of unlawful debt to the enterprise, which money transfers would not have been made but for Defendants' conduct.

335.   Accordingly, Defendants are jointly and severally liable in their individual capacities to Plaintiff Thomas and the Georgia § 16-14-4(c) Class for their actual damages, treble damages, punitive damages, costs, and attorneys' fees pursuant to Ga. Code Ann. § 16-14-6(c).

336.   Plaintiff Thomas and the Georgia § 16-14-4(c) Class have further been, and will continue to be, irreparably harmed by Defendants' violations of Georgia RICO § 16-14-4(c) such that they are entitled to injunctive relief under § 16-14-6(a)-(b) enjoining them from, at a minimum,

collecting on any unlawful loans issued to Plaintiff Thomas and the Class or continuing to issue such loans in violation of Georgia RICO and the Payday Lending Act.

### COUNT VIII:
### VIOLATIONS OF THE GEORGIA PAYDAY LENDING ACT
### O.C.G.A. § 16-17-1, *et seq.*
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

337.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

338.     This claim is brought individually and on behalf of the below class.

339.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Thomas brings this action for herself and on behalf of a class—the "Georgia Payday Lending Act Class"—initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Georgia, and (3) repaid any amount on the loans.

> Plaintiff Thomas is a member of the Georgia Payday Lending Act Class.

340.     Plaintiff Thomas may alter the class definition to conform to developments in the case and discovery.

341.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** While Plaintiff Thomas does not know the exact number of class members at this time, based on the class sizes in similar cases, Plaintiff Thomas anticipates that there are likely thousands of members. Thus, the Class is so numerous that joinder of all members is impracticable. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants and Minto Money, and the class members may be notified of the pendency of this action by published and/or mailed notice.

342. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of each Class, and there are no factual or legal issues that differ between the putative class members. These questions will predominate over the questions affecting only individual class members. The common questions include: (1) whether the form loan agreements contain invalid and unenforceable choice-of-law and dispute resolution provisions; (2) the facts surrounding the organization, structure and funding of the underlying enterprise, including with regard to control over the business and the performance of the various lender functions, as well as the flow of lending capital and revenue; (3) the nature and extent of Defendants' knowledge and participation in the affairs of the enterprise; (4) whether the loans are "unlawful debt" for purposes of the Payday Lending Act; (5) whether the loans are unlawful payday loans under Georgia RICO and/or the Industrial Loan Act or Payday Lending Act; (6) whether Defendants violated RICO and/or Georgia RICO by collecting on the loans; and (7) what is the proper recovery for Plaintiff and the class members against Defendants.

343. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Thomas's claims are typical of the claims of each putative class member. In addition, Plaintiff Thomas is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

344. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Thomas is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the

interests of the members of the class. Neither Plaintiff Thomas nor her counsel have any interests which might cause them to not vigorously pursue this action.

345. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

346. **Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2).** Defendants have acted or refused to act on grounds that apply generally to the class, rendering injunctive and declaratory relief appropriate respecting the class as a whole.

347. Defendants engaged in the business of making, offering, and/or arranging loans of $3,000.00 or less.

348. Defendants are not banks or credit unions, and are not licensed under any Georgia law to engage in that business.

349. Plaintiff Thomas and the class obtained loans from "Minto Money" and paid interest and other charges in doing so.

350. Defendants' conduct described herein violated and continues to violate O.C.G.A. § 16-17-2, which means that the loans of Plaintiff Thomas and the Class were void ab initio, that Defendants are barred from collecting any amounts on those loans, and that Defendants are additionally liable to Plaintiff Thomas and the members of the class for three times the amount of any interest or other charges, and attorneys' fees and costs. *See* O.C.G.A. § 16-17-3.

351. Accordingly, Plaintiff Thomas, individually and on behalf of the class, request: (i) payment of all principal of any loans repaid in the last 20 years; (ii) payment of triple the amount of any tips, fees, or other amounts repaid in the last 20 years; (iii) a declaration that Plaintiff Thomas's and the class members' loans were or are void ab initio; (iv) and an order prohibiting Defendant from attempting to debit Plaintiff Thomas's or the class members' bank accounts to repay any cash advances.

**COUNT IX:**
**DECLARATORY RELIEF**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

352. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

353. Plaintiff Thomas brings this claim individually and on behalf of the class.

354. The Georgia Industrial Loan Act prohibits lenders without a license from the Industrial Loan Commissioner from issuing loans of less than $3,000.00 to Georgia consumers at an interest rate greater than 8 percent and declares any loans issued in violation of the Act null and void. Ga. Code Ann. § 7-3-29(a).

355. The Payday Lending Act likewise prohibits unlicensed lenders from issuing loans of less than $3,000.00 to Georgia consumers without a license under the Industrial Loan Act or

other laws regulating financial institutions and declares any loans issued in violation of the Payday Lending Act "void ab initio." Ga. Code Ann. § 16-17-3.

356.     Neither Defendants, nor any other coconspirators in the lending enterprise, obtained a license under the Industrial Loan Act or any other relevant provision of the Georgia Code.

357.     Despite not having a license, Defendants, through their control of the lending entity, caused the making of loans to Plaintiff Thomas and the Georgia § 16-14-4(c) Class that had interest rates well above 8%.

358.     The loans issued to Plaintiff Thomas and the Georgia § 16-14-4(c) Class are thus null and void.

359.     Plaintiff Thomas and members of the Georgia § 16-14-4(c) Class are subject to ongoing harm absent a declaration that the loans were void, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

360.     The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the choice of law and forum-selection provisions.

361.     Defendants have acted or refused to act on grounds that apply generally to the class, rendering injunctive and declaratory relief appropriate respecting the class as a whole.

362.     Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

363.     Accordingly, Plaintiff Thomas and the Georgia § 16-14-4(c) Class seek a declaratory judgment against Defendants that the loans issued to them are invalid and

uncollectable. Plaintiff Thomas and the Georgia § 16-14-4(c) Class also seek to enjoin Defendants from collecting the loans.

### COUNT X:
### VIOLATIONS OF THE ILLINOIS INTEREST ACT
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

364.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

365.    Plaintiff Scales brings this claim individually and on behalf of the below class.

366.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Scales brings this action for herself and on behalf of a class—the "Illinois Usury Class"—initially defined as follows:

> All natural persons: (1) to whom a loan was made in the name of Minto Money at more than 9% interest, (2) from Illinois, and (3) which loan is still outstanding or has been paid on or after a date two years prior to the filing of suit.

> Plaintiff Scales is a member of the Illinois Usury Class.

367.    Plaintiff Scales may alter the class definition to conform to developments in the case and discovery.

368.    **Numerosity. Fed. R. Civ. P. 23(a)(1).** Based on the revenue collected from Illinois consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants and Minto Money, and the class members may be notified of the pendency of this action by published and/or mailed notice.

369.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate

over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to Illinois consumers violated 815 ILCS 205/4 because their interest levels were too high; (2) whether Plaintiff may recover from Defendants the amounts paid on the loans; and (3) what is the proper recovery for Plaintiff and the class members against each Defendant.

370. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Scales's claims are typical of the claims of each putative class member. In addition, Plaintiff Scales is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

371. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Scales is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class he seeks to represent;s he has retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Scales nor her counsel have any interests which might cause them to not vigorously pursue this action.

372. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay

and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

373.    All of the loans made to Illinois consumers in the name Minto Money were made at an interest rate greater than 9%.

374.    As explained above, Defendants received the proceeds, directly and indirectly, of the loans originated in the names of Minto Money.

375.    Defendants collected loans at more than 9% interest from Plaintiff Scales and the class members, in violation of 815 ILCS 205/4. Plaintiff Scales and the class members are entitled to statutory damages under 815 ILCS 205/6.

**COUNT XI:**
**VIOLATIONS OF THE PREDATORY LOAN PREVENTION ACT AND**
**THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

376.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

377.    Plaintiff Scales brings this claim individually and on behalf of the below class.

378.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Scales brings this action for herself and on behalf of a class—the "Predatory Loan Prevention Act Class"—initially defined as follows:

> All natural persons: (1) to whom a loan was made in the name of Minto Money at more than 36% interest (all Minto Money loans qualify), (2) from Illinois, and (3) on or after March 23, 2021.

> Plaintiff Scales is a member of the Predatory Loan Prevention Act Class.

379. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Based on the revenue collected from Illinois consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants and Minto Money, and the class members may be notified of the pendency of this action by published and/or mailed notice.

380. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans to Illinois consumers were made at interest rates exceeding 36% on or after March 23, 2021; (2) whether Plaintiff Scales may recover from Defendants the amounts paid on the loans; and (3) what is the proper recovery for Plaintiff Scales and the class members against each of the defendants.

381. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Scales's claims are typical of the claims of each putative class member. In addition, Plaintiff Scales is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

382. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Scales is an adequate representative of the putative class because her interests coincide with, and are not antagonistic to, the interests of the members of the class she seeks to represent; she has retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiff Scales and her counsel will fairly and adequately protect

the interests of the members of the class. Neither Plaintiff Scales nor her counsel have any interests which might cause them to not vigorously pursue this action.

383. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

384. All of the loans made to Illinois consumers in the name Minto Money were made at an interest rate exceeding 36%.

385. As explained above, Defendants received the proceeds, directly and indirectly, of the loans originated in the names of Minto Money.

386. Defendants collected loans prohibited by the Predatory Loan Prevention Act.

387. Violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

388.    There is a controversy between Plaintiff Scales and the class, on the one hand, and Defendants, on the other, as to whether Plaintiff Scales and the class members must repay the loans made to them.

389.    Declaratory relief will resolve such controversy.

390.    An injunction is necessary to prevent Defendants from taking any action to collect the void debts.

## COUNT XII:
## VIOLATIONS OF CALIFORNIA USURY LAWS
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

391.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

392.    Plaintiff McNutt brings this claim individually and on behalf of the below classes.

393.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff McNutt brings this action for himself and on behalf of the classes initially defined as follows:

**California Usury Class**: All California residents who made a payment on any loan with Minto Money in the two years prior to the filing of suit.

**California Treble Damages Subclass**: All California residents who made a payment on any loan with Minto Money on or after November 11, 2023.

Plaintiff McNutt is a member of the foregoing class and subclass.

394.    **Numerosity. Fed. R. Civ. P. 23(a)(1).** Based on the revenue collected from California consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Minto Money and CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

395.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**
Common questions of law and fact exist as to all members of the putative class, and there are no
factual or legal issues that differ between the putative class members. These questions predominate
over the questions affecting only individual class members. The principal issues include: (1)
whether the loans made to California consumers violated Art. XV § 1 of California's Constitution
because their interest levels were too high; (2) whether Plaintiff McNutt may recover from
Defendants the amounts paid on the loans; and (3) what is the proper recovery for Plaintiff McNutt
and the class members against each Defendant.

396.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff McNutt's claims are typical of the
claims of each putative class member. In addition, Plaintiff McNutt is entitled to relief under the
same causes of action as the other members of the putative class. All claims are based on the same
facts and legal theories.

397.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff McNutt is an
adequate representative of the putative class because his interests coincide with, and are not
antagonistic to, the interests of the members of the class he seeks to represent; he has retained
counsel competent and experienced in such litigation; and they have and intend to continue to
prosecute the action vigorously. Plaintiff McNutt and his counsel will fairly and adequately protect
the interests of the members of the class. Neither Plaintiff McNutt nor his counsel have any
interests which might cause them to not vigorously pursue this action.

398.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the
class members predominate over questions affecting only individual members, and a class action
is superior to other available methods for fair and efficient adjudication of the controversy. The
damages sought by each member are such that individual prosecution would prove burdensome

and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof.

399. All of the loans made to California consumers in the name of Minto Money were made at an interest rate greater than 12%.

400. As explained above, Defendants received the proceeds, directly or indirectly, of the loans nominally made by Minto Money.

401. Accordingly, Plaintiff McNutt and the class members are entitled to recover all interest paid on the loans in excess of 10%, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3.

## COUNT XIII:
## VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW:
## UNLAWFUL CONDUCT
## Cal. Bus. & Prof. Code §§ 17200 *et seq*.

402. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

403. Plaintiff McNutt brings this claim individually and on behalf of the below class.

404. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff McNutt brings this action for himself and on behalf of the class initially defined as follows:

All natural persons: (1) to whom a loan was made in the name of Minto Money, (2) from California, and (3) which loan was made in the two years prior to the filing of suit.

Plaintiff McNutt is a member of the foregoing class.

405.    **Numerosity. Fed. R. Civ. P. 23(a)(1).** Based on the revenue collected from California consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Minto Money and CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

406.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to California consumers violated Art. XV § 1 of California's Constitution because their interest levels were too high; (2) whether Plaintiff McNutt may recover from Defendants the amounts paid on the loans; and (3) what is the proper recovery for Plaintiff McNutt and the class members against each Defendant.

407.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff McNutt's claims are typical of the claims of each putative class member. In addition, Plaintiff McNutt is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

408.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff McNutt is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the members of the class he seeks to represent; he has retained counsel competent and experienced in such litigation; and they have and intend to continue to

prosecute the action vigorously. Plaintiff McNutt and his counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff McNutt nor his counsel have any interests which might cause them to not vigorously pursue this action.

409.    **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof.

410.    The California Business & Professions Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Defendants violated (and continue to violate) California's Unfair Competition Law, California Business & Professions Code § 17200 *et seq*., by engaging in the above-described unlawful, unfair, unconscionable, fraudulent, deceptive, untrue, and misleading acts and practices.

411.    The Financial Code provides that any loan found to be unconscionable pursuant to Section 1670.5 of the Civil Code shall be deemed in violation of Cal. Fin. Code § 22302.

412.    Pursuant to Cal. Fin. Code § 22750 the loans are void and unenforceable.

79

413.     There is a controversy between Plaintiff McNutt and the class, on the one hand, and Defendants, on the other, as to whether Plaintiff McNutt and the class members must repay the loans made to them.

414.     Declaratory relief will resolve such controversy.

415.     Plaintiff McNutt and the class also seek an injunction prohibiting any future collection of their loans. Cal. Bus. & Prof. Code § 17203.

416.     Plaintiff McNutt and the Class are entitled to their reasonable attorneys' fees and costs pursuant to Cal. Code Civ. P. § 1021.5.

## COUNT XIV:
## VIOLATIONS OF WASHINGTON USURY LAWS
## RCW 19.52.030
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

417.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

418.     Plaintiff Porter brings this claim individually and on behalf of the below class.

419.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Porter brings this action for himself and on behalf of a class—the "Washington Usury Class"—initially defined as follows:

All natural persons: (1) to whom a loan was made in the name of Minto Money at more 12% interest, (2) from Washington, and (3) which loan was made in the four years prior to the filing of suit.

Plaintiff Porter is a member of the Washington Usury Class.

420.     Plaintiff Porter may alter the class definition to conform to developments in the case and discovery.

421.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Based on the revenue collected from Washington consumers, numerosity is easily satisfied. Additionally, the names and addresses of

the class members are identifiable through the internal business records maintained by Defendants and Minto Money, and the class members may be notified of the pendency of this action by published and/or mailed notice.

422. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to Washington consumers were usurious; (2) whether Plaintiff may recover from Defendants the amounts paid on the loans; and (3) what is the proper recovery for Plaintiff Porter and the class members against each Defendant.

423. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Porter's claims are typical of the claims of each putative class member. In addition, Plaintiff Porter is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

424. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Porter is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the members of the class he seeks to represent; he has retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Porter nor his counsel have any interests which might cause them to not vigorously pursue this action.

425. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action

81

is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

426. **Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2)**. Defendants have acted or refused to act on grounds that apply generally to the class, rendering injunctive and declaratory relief appropriate respecting the class as a whole.

427. All of the loans made to Washington consumers in the name Minto Money were made at an interest rate greater than 200%.

428. As explained above, Defendants received the proceeds, directly or indirectly, of the loans originated in the names of Minto Money.

429. Therefore, Plaintiff Porter and Washington Usury Class members are entitled to a declaration that the Minto Money loans made to them are usurious. Plaintiff Porter and Washington Usury Class are also entitled to recover any amounts paid in excess of the amount Defendants are entitled to collect on the loans, pursuant to RCW 19.52.030.

## COUNT XV:
## VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT
## RCW 19.86.020 and RCW 19.52.036
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

430.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

431.     Plaintiff Porter brings this claim individually and on behalf of the below class.

432.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Porter brings this action for himself and on behalf of a class—the "Washington Consumer Protection Act Class"—initially defined as follows:

> All natural persons: (1) to whom a loan was made in the name of Minto Money at more 12% interest, (2) from Washington, and (3) which loan was made in the four years prior to the filing of suit.

> Plaintiff Porter is a member of the Washington Consumer Protection Act Class.

433.     Plaintiff Porter may alter the class definition to conform to developments in the case and discovery.

434.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Based on the revenue collected from Washington consumers, numerosity is easily satisfied. Additionally, the names and addresses of the class members are identifiable through the internal business records maintained by Defendants and Minto Money, and the class members may be notified of the pendency of this action by published and/or mailed notice.

435.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loans made to Washington consumers were usurious; (2) whether Plaintiff may recover

from Defendants the amounts paid on the loans; and (3) what is the proper recovery for Plaintiff Porter and the class members against each Defendant.

436. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Porter's claims are typical of the claims of each putative class member. In addition, Plaintiff Porter is entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

437. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Porter is an adequate representative of the putative class because his interests coincide with, and are not antagonistic to, the interests of the members of the class he seeks to represent; he has retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiff Porter nor his counsel have any interests which might cause them to not vigorously pursue this action.

438. **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the

litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

439.  **Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2)**. Defendants have acted or refused to act on grounds that apply generally to the class, rendering injunctive and declaratory relief appropriate respecting the class as a whole.

440.  Plaintiff and Washington Consumer Protection Act Class are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

441.  Pursuant to RCW 19.52.036, "[e]ntering into or transacting a usurious contract" is per se "an unfair act or practice in the conduct of commerce for purposes of application of the consumer protection act."

442.  As alleged above, Defendants entered into or transacted usurious contracts with Plaintiff Porter and the Washington Consumer Protection Act Class by contracting for interest rates exceeding the statutory maximum of twelve percent. Thus, Defendants engaged in unfair acts or practices in the conduct of commerce.

443.  Defendants' deceptive acts or practices have impacted the public interest because they have injured Plaintiff Porter and thousands of Washington residents by charging them interest in excess of the amount allowed by law.

444.  As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and the Washington Consumer Protection Act Class have been injured. Defendants' conduct has injured the property of Plaintiff Porter and the other class members by charging and collecting interest that they were not legally entitled to charge or collect.

445.  Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff Porter and Washington Class members, particularly since Defendants continue to make

or direct the making of loans to Washington residents at usurious interest rates and continue to collect unlawful interest on usurious loans already made to Washington residents. Thus, Plaintiff Porter and the Washington Consumer Protection Act Class will suffer continuing, immediate, and irreparable injury absent obtaining injunctive and declaratory relief.

446.    Plaintiff Porter and the Washington Consumer Protection Act Class are also entitled to recover actual damages, treble damages, and attorneys' fees and costs pursuant to RCW 19.86.090.

### COUNT XVI:
### UNJUST ENRICHMENT
### (CLASS CLAIM AGAINST ALL DEFENDANTS)

447.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

448.    This claim is brought individually and on behalf of the below classes.

449.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Unjust Enrichment Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming, and (3) repaid any amount on the loans.

> Plaintiffs are members of the Unjust Enrichment Class.

450.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Scales brings this action for herself and on behalf of a class—the "Illinois Unjust Enrichment Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, and (3) repaid any amount on the loans.

Plaintiff Scales is a member of the Illinois Unjust Enrichment Subclass.

451. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Thomas brings this action for herself and on behalf of a class—the "Georgia Unjust Enrichment Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Georgia, and (3) repaid any amount on the loans.

Plaintiff Thomas is a member of the Georgia Unjust Enrichment Subclass.

452. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Porter brings this action for himself and on behalf of a class—the "Washington Unjust Enrichment Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Washington, and (3) repaid any amount on the loans.

Plaintiff Porter is a member of the Washington Unjust Enrichment Subclass.

453. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Simone brings this action for himself and on behalf of a class—the "Kansas Unjust Enrichment Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Kansas, and (3) repaid any amount on the loans.

Plaintiff Simone is a member of the Kansas Unjust Enrichment Subclass.

454. **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained

by Minto Money and CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

455.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selection of tribal law are enforceable; (3) whether Plaintiffs and the class members conferred a benefit on Defendants; (4) whether Defendants knew or should have known of the benefit; (5) whether Defendants retained an unjust benefit because the loan was void; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

456.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

457.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

458.     As detailed above, all loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia,

Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming were and are unenforceable.

459.    Plaintiffs and the class members conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefits; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

460.    Accordingly, on behalf of themselves and the class defined above, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with Minto Money.

**COUNT XVII:**
**COMMON LAW CONSPIRACY**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

461.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

462.    This claim is brought individually and on behalf of the below classes.

463.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs brings this action for themselves and on behalf of a class—the "Common Law Conspiracy Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from
> Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado,
> Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas,
> Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi,
> Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North
> Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South

Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming, and (3) repaid any amount on the loans.

Plaintiffs are members of the Common Law Conspiracy Class.

464. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Scales brings this action for herself and on behalf of a class—the "Illinois Common Law Conspiracy Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Illinois, and (3) repaid any amount on the loans.

Plaintiff Scales is a member of the Illinois Common Law Conspiracy Subclass.

465. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Thomas brings this action for herself and on behalf of a class—the "Georgia Common Law Conspiracy Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Georgia, and (3) repaid any amount on the loans.

Plaintiff Thomas is a member of the Georgia Common Law Conspiracy Subclass

466. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff McNutt brings this action for himself and on behalf of a class—the "California Common Law Conspiracy Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from California, and (3) repaid any amount on the loans.

Plaintiff McNutt is a member of the California Common Law Conspiracy Subclass.

467. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Porter brings this action for himself and on behalf of a class—the "Washington Common Law Conspiracy Subclass"—initially defined as:

All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Washington, and (3) repaid any amount on the loans.

Plaintiff Simone is a member of the Washington Common Law Conspiracy Subclass.

468.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Simone brings this action for himself and on behalf of a class—the "Kansas Common Law Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Minto Money, (2) from Kansas, and (3) repaid any amount on the loans.

Plaintiff Simone is a member of the Kansas Common Law Conspiracy Subclass.

469.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Minto Money and CreditServe, and the class members may be notified of the pendency of this action by published and/or mailed notice.

470.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and the selection of tribal law are enforceable; (3) whether Defendants combined together or with others to accomplish an unlawful purpose; (4) whether at least one member of the conspiracy committed an unlawful act; (5) whether collection of a usurious and unenforceable loan caused injuries to Plaintiffs and the class members; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

471. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

472. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

473. As detailed above, all loans made to consumers in Illinois, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Virginia, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, and Wyoming are unenforceable.

474. As alleged above, Defendants violated state common law conspiracy prohibitions by joining together through a series of agreements to accomplish the making, collection, and profiting from the blatantly illegal usurious loans. Among others, these agreements include the original agreements related to the origination, funding, and servicing of the loans, as well as the merger agreements designed to shield the non-tribal outsiders from liability and facilitate the continued illegal lending activities through the promissory notes and related documents.

475.     Plaintiffs and the class members were injured as a result of Defendants' violations because they repaid amounts arising from the unlawful conspiracy.

476.     As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment for Plaintiffs and against Defendants as follows:

A.     An Order certifying the proposed Classes and Subclasses under Fed. R. Civ. P. 23 (b)(2) and (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B.     An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C.     An Order declaring that Defendants committed the violations of law alleged herein, including violations of the Illinois Predatory Loan Prevention Act, the Consumer Fraud and Deceptive Business Practices Act, and the Payday Lending Act.

D.     An Order enjoining Defendants from taking any further action to collect the illegal loans;

E.     An Order providing for any and all injunctive and declaratory relief the Court deems appropriate;

F.     An Order awarding monetary damages, including, but not limited to, any and all actual, statutory, punitive, compensatory, incidental, and consequential damages in an amount to be determined by the trier of fact;

G.   An Order awarding treble damages in an amount consistent with applicable law;

H.   An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

I.   An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

J.   Such further relief as this Court may deem just and proper.


Dated: January 15, 2025

**WALLACE MILLER**

*/s/ Matthew J. Goldstein*

Edward A. Wallace
Mark R. Miller
Matthew J. Goldstein
150 N. Wacker Drive, Suite 1100
Chicago, IL 60606
T: 312.261.6193
F: 312.275.8174
eaw@wallacemiller.com
mrm@wallacemiller.com
mjg@wallacemiller.com


**STRAUSS BORRELLI PLLC**
Samuel J. Strauss
Stephen Pigozzi
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
T: 872.263.1100
F: 872.263.1109
sam@straussborrelli.com
spigozzi@straussborrelli.com

*Counsel for Plaintiffs*

94

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury.


Dated: January 15, 2025

**WALLACE MILLER**

*/s/ Matthew J. Goldstein*

Edward A. Wallace
Mark R. Miller
Matthew J. Goldstein
150 N. Wacker Drive, Suite 1100
Chicago, IL 60606
T: 312.261.6193
F: 312.275.8174
eaw@wallacemiller.com
mrm@wallacemiller.com
mjg@wallacemiller.com


**STRAUSS BORRELLI PLLC**
Samuel J. Strauss
Stephen Pigozzi
980 N. Michigan Ave., Suite 1610
Chicago, IL 60611
T: 872.263.1100
F: 872.263.1109
sam@straussborrelli.com
spigozzi@straussborrelli.com

*Counsel for Plaintiffs*